## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

TE PRODUCTS PIPELINE
COMPANY, LLC                                                          PLAINTIFF

v.                          **CASE NO. 4:08CV000204 BSM**

DAVIDSON RANCH, INC.                                                  DEFENDANT

## ORDER

Pending are defendant Davidson Ranch, Inc.'s motion for partial summary judgment
[Doc. No. 19] and motion for hearing on its motion for partial summary judgment [Doc. No.
36]. For the reasons stated below, the motions are denied.

## I. BACKGROUND

In summary judgment cases the facts are viewed in the light most favorable to the
nonmoving party. *See Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, *531 (8th Cir.
2008). With this in mind, the undisputed facts are as follows.[1]

On August 8, 1942 a right-of-way agreement was recorded in the office of the
recorder for Pulaski County, Arkansas. The agreement conveyed upon the Defense Plant
Corporation, its successors and assigns:

> The right to lay, operate, renew, alter, inspect and maintain a pipeline
> for the transportation of oil, gas, petroleum products or any other

---

[1]The plaintiff has basically disputed each and every paragraph of the defendant's
statement of undisputed facts, so the facts have been drawn from the Exhibits and Affidavits
submitted by the parties.

material or substances which can be transported through a pipeline, or nay one or more of said substances, [the Defense Plant Corporation] selecting the route, upon, over, under and through the following described land situated in the County of Pulaski State of Arkansas:

> SW¼ NW¼ Section 13-2N-11 W;
> NW¼ SW¼ Section 13-2N-11W

and also the right, . . ., to lay, operate, renew, alter, inspect and maintain a second pipeline for the transportation, adjacent to and parallel with the first pipeline;   and [the Defense Corporation] at any and all reasonable times shall have the right of ingress and egress to and from such pipelines, and may remove the same, in whole or in part.

[π's Exhibit 6-C;  Δ's Exhibit C]. Later the right-of-way was more fully described as being in the following described lands:

> The North Half of the Northeast Quarter (N½  of NE¼) of Section 23-2N-11W;  the South Half of the Northeast Quarter of the Southeast Quarter (S½ of NE¼ of SE¼) of Section 14-2N-11W; the Southeast Quarter of the Southeast Quarter (SE¼ of SE¼) of Section 14-2N-11W; the Southwest Quarter of the Southeast Quarter (SW¼ of SE¼) of Section 14-2N-11W;  the Southeast Quarter of the Northwest Quarter (SE¼ of NW¼) of Section 13-2N-11W; the Northeast Quarter of the Northwest Quarter (NE¼ of NW¼) of Section 13-2N-11W.

[π's Exhibit 6-B;  Δ's Exhibit B].  In 1947, Texas Eastern Transmission Corporation (Texas Eastern) succeeded to all rights acquired and formerly held by the Defense Plant Corporation including the aforementioned right-of-way.  [π's Exhibit 6-B;  Δ's Exhibit B].  By 1964, two pipelines had been constructed on and across the lands and the Northwest Land Company had acquired ownership of the tracts affected by the right-of-way and easement.  [π's Exhibit 6-B; Δ's Exhibit B].

On February 5, 1964, Texas Eastern and the Northwest Land Company entered into

a new right-of-way agreement (the 1964 agreement) that restricted Texas Eastern's exercise and enjoyment of the easement and right-of-way.   [π's Exhibit 6-B;  Δ's Exhibit B]   The new right-of-way agreement restricted Texas Eastern's easement and right-of-way privileges to a strip of land seventy-five (75) feet in width;  the strip being fifty (50) feet in width on the northwesterly side and twenty-five (25) feet in width on the southeasterly side of the centerline of the southeasterly existing pipeline owned by Texas Eastern. [π's Exhibit 6-B; Δ's Exhibit B].  In exchange, the Northwest Land Company agreed not to erect, construct or create any building, structure or obstruction of any kind either above or below the surface of the ground on said seventy-five foot permanent right-of-way, change the grade or cause any water reservoir or artificial lake or body of water to be created or constructed on the right-of-way or conduct mining operations on or under the land or in such proximity to the pipelines so as to endanger the pipelines or permit any of these thing to be done by other without Texas Eastern's written consent. [π's Exhibit 6-B;  Δ's Exhibit B].  The 1964 agreement provided an exception for subdivision development.  [π's Exhibit 6-B;  Δ's Exhibit B].  The 1964 agreement further provided that " [s]ubject to the effect of the foregoing agreements, all of the terms and conditions of the above mentioned Right-of-Way Grant executed on August 8, 1942, in favor of Defense Plant Corporation, shall remain in full force and effect unchanged and unaltered." [π's Exhibit 6-B;  Δ's Exhibit B].

In 1980, the Harris Company/Harris Family Company, LLC [Harris Company] granted Texas Eastern a right-of-way and easement to construct, lay, maintain, operate, alter,

repair, remove, and replace a pipeline and appurtenances thereto to two tracts of land.  [π's

Exhibit 6-A;  Δ's Exhibit A].   The first tract, Tract I, was described as follows:

> A permanent right-of-way fifty (500 feet in width over and across the
> Southwest Quarter (SW ¼) and the South Half (S ½) of the Northwest
> Quarter (NW ¼) of Section 23, Township 2 North, Range 11 West; said
> permanent right-of-way being 25 feet in width on the southeasterly side
> and 25 feet in width on the northwesterly side of the following
> described centerline.
>
> Commencing at a point in the west line of the SW ¼ of Section 23
> aforesaid, said point being located 480 feet north from the most
> northerly southwest corner thereof.  Said point also being located 15
> feet northwesterly at a right angle from an existing 20" pipeline; thence
> parallel to said existing 20" pipeline and 15 feet therefrom, North 45°
> 07' East, 1200 feet to point of beginning;  thence diverging from said
> existing 20" pipeline, North 65°19' East, 40 feet to a point; thence
> North 85° 31" East, 3 feet to a point, said point being where a 16"
> pipeline crosses an existing 20" pipeline;  thence continuing along said
> tangent 36 feet to a point, said point being where a 16" pipeline crosses
> and existing 24" pipeline; thence continuing along said tangent, 57 feet
> to a point; thence North 65° 19' East, 40 feet to a point, said point also
> being located 25 feet southeasterly at a right angle from an existing 24"
> pipeline; thence parallel to said existing 24" pipeline and 25 feet
> therefrom, North 45° 14' East, 2254 feet to a point of exit in the north
> line of the above described tract of land, said point being located 162
> feet West from a fence corner, same being the Northwest Quarter of
> Section 23 (NE Corner of S ½ of NW ¼ of Section 23), Township 2
> North, Range 11 West.  The herein described permanent right-of-way
> containing 2.74 acres of land, more or less.

[π's Exhibit 6-A;  Δ's Exhibit A].  The second tract, Tract II, was described as:

> A permanent right-of-way fifty (50) feet in width over and across the
> North Half (N ½) of the Southwest Quarter (SW 1/4) and the Northwest
> Quarter (NW 1/4) of Section 13, Township 2 North, Range 11 West.
> The said permanent right-of-way being 25 feet in width on the
> northwesterly side and 25 feet in width on the southeasterly side of the
> following described centerline:

> Beginning at a point in the west line of the North Half (N ½) of the
> Southwest Quarter (SW ¼), said point being located 550 feet north of
> the southwest corner of said tract, said point also being located
> southeasterly 25 feet at a right angle from an existing 24" pipeline;
> thence parallel to said existing pipeline and 25 feet therefrom, North
> 45° 28' East, 98 feet to an angle point; thence North 45° 216' East,
> 3710 feet to a point of exit in the east line of the Northwest Quarter,
> said point of exit being located 811 feet South from the northeast corner
> thereof.  The herein described permanent right-of-way containing 4.38
> acres of land, more or less.

[π's Exhibit 6-A;  Δ's Exhibit A].  The grant went on to state that "[t]o have and to hold unto grantee, its successors and assigns, with ingress to and egress from the premises, for the purposes herein granted.  The rights herein granted may be assigned in whole or in part."

On May 29, 2003, Davidson Ranch, Inc. (the ranch), an Arkansas corporation purchased the Harris Company property.  The purchase was:

> [S]ubject to (a) all recorded rights-of-way, permits, easements, agreements and
> restrictions, (b) all rights to the continued use of the cemetery or part of the
> property including the rights of ingress and egress thereto, (c) all rights to the
> continued use of the lake lying within the bounds of the property, and (d)
> encroachments and variations in the location of fences as shown on [the] Plat
> of Survey[.]

The ranch is accessible from the south via Harris Road. [Affidavit of Perry Patterson ¶ 8].  Harris Road has been a public road since June 17, 1970. [Affidavit of Sherman Smith ¶ 3]. The ranch maintains a private locked gate across Harris Road. [Affidavit of Perry Patterson ¶ 9].  According to Sherman Smith, the Director of Public Works for Pulaski County, Arkansas, the northern terminus of Harris Road is the gate in Section 13, Township 2N and Range 11 West just to the northwest of a private cemetery. [Affidavit of Sherman

Smith ¶ 4].

TE Products Pipeline Company (TEPPCO) was originally part of Texas Eastern; however, for the past twenty years, it has been an entirely separate corporation and is part of Spectra Energy. [Affidavit of Mike Brown ¶ 11]. TEPPCO is a common carrier engaged in the transportation of liquid petroleum products by interstate pipelines in accordance with the laws and regulations and permits from various state and federal government agencies. [Affidavit of Mike Brown ¶ 11]. It owns and operates products pipelines P2 and P62, which traverse the ranch's property along a route running southwest to northeast. [Affidavit of Mike Brown ¶ 11; Affidavit of Perry Patterson ¶ 4]. Texas Eastern's interstate gas pipeline is situated between three lines on the ranch's property. P2 is north of Texas Eastern's gas pipeline and P62 is south of the Texas Eastern pipeline. [Affidavit of Mike Brown ¶ 12]. TEPPCO has an easement across the ranch's property for the installation, operation, and maintenance of its pipelines. [Affidavit of Perry Patterson ¶ 4].

The United States Department of Transportation requires TEPPCO to conduct periodic internal inspections of its pipelines. [Affidavit of Mike Brown ¶ 4]. This is accomplished by placing an internal inspection device inside the pipeline to measure wall thickness and locate other conditions inside the pipeline that might affect the pipeline's integrity. [Affidavit of Greg Eubank ¶ 4]. In 2007-2008, while conducting an inspection of its pipelines, an anomaly was detected in the P2 pipeline.

TEPPCO informed the ranch that it needed to access the P2 pipeline at the location

of the anomaly so that it could uncover the pipeline and perform visual and mechanical inspections of the pipeline to determine whether repair or replacement was necessary. [Affidavit of Mike Brown ¶ 6].  TEPPCO sought access via a route that ran 300 yards from the end of Harris Road.  This route crosses through the ranch's barnyard and a portion of its pasture.  [Affidavit of Mike Brown ¶ 5].  The ranch responded that it would cost TEPPCO $20,000 to come across its property other than by use of TEPPCO's right-of-way. [Affidavit of Mike Brown ¶ 6].

TEPPCO filed suit on March 13, 2008.  In its complaint, TEPPCO asks that the court: (1) declare that TEPPCO may enter the ranch's property, inspect its pipeline and make whatever repairs are necessary; (2) grant TEPPCO' a temporary restraining order to prevent the ranch from interfering with its maintenance of its pipeline; (3) enter a permanent injunction to enjoin the ranch from interfering with TEPPCO's representatives' access to its right-of-way by the shortest, safest route for inspection and repair of the pipeline located on the ranch's property; (4) award TEPPCO in excess of $75,000 for the damages it suffered as a result of the ranch's denial of entry to its property to access TEPPCO's right-of-way to inspect its pipeline and make necessary repairs and losses caused by delay; (5) award TEPPCO attorney's fees and costs incurred in enforcing its easement; and (6) grant TEPPCO all other just and proper relief to which it may be entitled.

On March 19, 2008, the parties reached an agreement as to a preliminary injunction that would allow TEPPCO to cross the ranch's property to perform maintenance and

investigative work required by the Department of Transportation without the waiver of any defenses by the ranch.  The agreement was memorialized in an Agreed Order that was entered on March 20, 2008.

The ranch later file a counterclaim for declaratory relief, asking the court to decide the extent of the easement claimed by TEPPCO and to rule that the easement does not allow access to the easement from or across the ranch's other property, declare that Harris Road is only a public street to Ink Bayou and thereafter it is a private road, and award attorney's fees.  On May 9, 2009, an order was entered denying TEPPCO's motion to dismiss the ranch's counterclaim.

The ranch now moves for partial summary judgment, asserting that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law as to the parties' competing declaratory judgment claims.  TEPPCO responds that there are many genuine issues of material fact, including: (1) whether Harris Road is a public road and, if so, its extent; (2) whether TEPPCO is entitled to cross the ranch's property to reach its right-of-way pursuant to the grants to TEPPCO and its predecessors in title; (3) whether the manner used by TEPPCO in 2008 to access its P62 pipeline, which is the subject matter of this case, is the least intrusive and causes the least damage to the ranch property;  (4) whether the ranch suffered any damages by reason of TEPPCO's inspection and maintenance of its P62 pipeline in 2008; (5) the location and extent of TEPPCO's rights-of-ways across the ranch property; (6) whether TEPPCO's access to its pipeline across the ranch's property

8

amounts to a "taking" under the Constitutions of the State of Arkansas or the United States;

and (7) whether the access from the north across property owned by Danco Construction is

possible, practical, and a less intrusive route to access TEPPCO's right-of-way at the point

where the anomaly was discovered and repaired in 2008.

## II.  STANDARD

Summary judgment is appropriate if the facts, viewed in the light most favorable to

the non-moving party, show that there is no genuine issue of material fact and the moving

party is entitled to judgment as a matter of law.  *Anda*, 517 F.3d at *531; *Peterson v. Scott

County*, 406 F.3d 515, *520 (8th Cir. 2005). The nonmoving party must show the existence

of facts on the record which create a genuine issue.  *Larson v. Kempker*, 414 F.3d 936, *939

(8th Cir. 2005).  To establish the existence of a genuine issue of material fact the nonmoving

party may not merely point to unsupported self-serving allegations.  *Smith v. Int'l Paper Co.*,

523 F.3d 845, *848 (8th Cir. 2008).  The nonmoving party must substantiate the nonmoving

party's allegations with sufficient probative evidence that would permit a finding in the

nonmoving party's favor.  *Id*.

## III.  DISCUSSION

The person who asserts an easement has the burden of proving the existence of the

easement.  *Hanna v. Robinson*, 86 Ark. App. 180, *185, 167 S.W.3d 166, **170 (2004); *R

& T Props. v. Reyna*, 76 Ark. App. 198, *200, 61 S.W.3d 229, **230 (2001).  In general, an

express easement may be created by written instrument.  *Kenndy v. Papp*, 294 Ark. 88, *92,

9

741 S.W.2d 625, **628 (1987); *Wilson v. Johnston*, 66 Ark. App. 193, *197, 990 S.W.2d 554, **556 (1999).  A primary characteristic of an easement is that its burdens fall upon the possessor of the land from which it issues.  *Natural Gas Pipeline Co. of Am. v. Cox*, 490 F. Supp. 452, *454 (E.D. Ark. 1980).  This characteristic is expressed in the statement that the land constitutes a servient tenement and the easement a dominant tenement.  *Id*.

The grant of an easement normally will control its location if the location is specified therein.  *Wilson*, 66 Ark. App. at *197, 990 S.W.2d at **556.  The grant should identify an easement's location with specificity.  *Id*.  In other words, the description of the easement requires such that a surveyor can go on the land and locate the easement from such description.  *Id*.  However, it is not essential to the validity of the grant of the easement that it be described by metes and bounds or by figures giving definite dimensions of the easement.  *Hatfield v. Ark. W. Gas Co.*, 5 Ark. App. 26, *28, 632 S.W.2d 238, **240 ( 1982).  The grant of the easement is valid when it designates the easement or right-of-way as such and describes the lands which are made servient to the easement.  *Id*.  While the owner of the servient estate has the right to limit the location of an easement, where he fails to do so it may be selected by the grantee so long as his selection is a reasonable one taking into consideration the interest and convenience of both estates.  *Id*.; *see Lawson v. Sipple*, 319 Ark. 543, *552, 893 S.W.2d 757, **762 (1995).  Where the grant of the right-of-way is not bounded in the deed, it is to be bounded by lines of reasonable enjoyment.  *Hatfield*, 5 Ark. App. at *28, 632 S.W.2d at **240; *see Lawson*, 319 Ark. at *552; 893 S.W.2d at **762.

The ranch first argues that the language in the grant is unambiguous, and does not include a separate right of ingress and egress outside of the easement.  TEPPCO counters by asserting that the easements granted to it are unambiguous and grant TEPPCO a right-of-way for TEPPCO's ingress and egress.  An easement or right-of-way is an interest in land and is conveyed by deed the same as land is conveyed.  *Hatfield*, 5 Ark. App. at *28, 632 S.W.2d at **240.

When interpreting a deed, the court gives primary consideration to the intent of the grantor.  *Harrison v. Loyd*, 87 Ark. App. 356, *365, 192 S.W.3d 257, **263 (2004); *Sides v. Beene*, 327 Ark. 401, *404, 938 S.W.2d 840, **842 (1997).  The intent of the grantor is gathered solely from the language of the deed unless the language of the instrument is ambiguous, uncertain, or doubtful.  *Sides*, 327 Ark. at *404, 938 S.W.2d at **842.

When a deed is ambiguous, the court will resort to rules of construction and puts itself as nearly as possible in the position of the parties to the deed, particularly the grantor, and interprets the language in light of the attendant circumstances.  *See Harrison*, 87 Ark. App. at *365, 192 S.W.3d at **263; *Bishop v. City of Fayetteville*, 81 Ark. App. 1, *8, 97 S.W.3d 913, **918-19 (2003).  It is only in case of an ambiguity that a deed is construed most strongly against the party who prepared it.  *Harrison*, 87 Ark. App. at *365, 192 S.W.3d at **263; *Bishop*, 81 Ark. App. at *8, 97 S.W.3d at **919.  Even then, the rule is one of last resort to be applied only when all other rules for construing an ambiguous deed fail to lead to a satisfactory clarification of the instrument and is particularly subservient to the

11

paramount rule that the intention of the parties must be given effect, insofar as it may be ascertained, and to the rule that every part of a deed should be harmonized and reconciled so that all may stand together and none be rejected. *Harrison*, 87 Ark. App. at *365, 192 S.W.3d at **263; *Bishop*, 81 Ark. App. at *8-9, 97 S.W.3d at **919. In arriving at the intention of the parties, the courts may consider and accord considerable weight to the construction of an ambiguous deed by the parties themselves, evidenced by subsequent statements, acts, and conduct. *Harrison*, 87 Ark. App. at *365, 192 S.W.3d at **263; *Bishop*, 81 Ark. App. at *8, 97 S.W.3d at **918-19. Courts may also acquaint themselves with and consider circumstances existing at the time of the execution of a contract and the situation of the parties who made it. *Harrison*, 87 Ark. App. at *365, 192 S.W.3d at **263; *Bishop*, 81 Ark. App. at *9, 97 S.W.3d at **919.

Summary judgment may be based upon an unambiguous, written instrument. *Bishop*, 81 Ark. App. at *9, 97 S.W.3d at **919. The deeds in this case clearly and unambiguously convey unto the grantee, its successors, and assigns, the right of ingress and egress and the parties are in agreement as to this fact. What is unclear from the deeds is the location of the grantee's right of ingress and egress.

The ranch believes that the right of ingress and egress is limited to the area described in the deeds. The ranch admits that the 1942 deed failed to specify the location of ingress and egress. The ranch asserts that the terms "restricted to a strip of land" found in the 1964 agreement limits the right of ingress and egress to the seventy-five foot strip of land

12

described in the agreement.  The ranch believes that this language makes it clear that the parties intended that the activities of the grantee, it successors, and assigns are to occur within the restricted strip of land.

In further support of its contention that TEPPCO's right of ingress and egress is limited to the easement, the ranch relies on language from the 1980 deed.  The 1980 deed describes two fifty foot wide easements.  The deed states that the grantee shall have the right of ingress and egress from the "premises."  The ranch believes that the term "premises" means the easements themselves.

TEPPCO believes that it has a right to use the ranch's property to access its pipeline and relies in part on *Loyd v. Southwest Arkansas Utilities Corp.*, 264 Ark. 818, 580 S.W.2d 935 (1979).  The *Loyd* case is an eminent domain case in which a utility company condemned a one hundred foot strip of the landowners property for the purposes of constructing an electric transmission line.  In addition to taking the one hundred foot right-of-way, the utility company also attempted to take an undefined right of ingress and egress over all of the property owners' property.  The landowners objected, arguing that the taking of the  right of ingress and egress amounted to the taking of an easement and that the utility company should therefore pay the full market value for all of the property.  The utility company argued that the right of ingress and egress taken was merely a "secondary easement"[2] and that payment

---

[2]A secondary easement has been defined as:

> The right to enter upon the servient tenement for the purpose of repairing or renewing an artificial structure, constituting an easement, is called a secondary easement, a mere incident of the easement that passes by express or implied grant, or is acquired

as though the property was taken in fee was unreasonable. The trial court adopted the utility company's position and the case was appealed.

The Arkansas supreme court reversed, finding that:

> [A] secondary easement does not necessarily exist in every case. For example, a highway department or railroad company would not have a right of ingress or egress over all adjacent land to its rights-of-way. It is not needed because access is inherent in such easements or rights-of-way. Nor would one exist where access to a right-of-way, such as that taken in this case, already exists.

*Id*. at *824, 580 S.W.2d at **938. The court went on to state that it never had an occasion to recognize a secondary easement and that there was no need to do so in the *Loyd* case, because what the utility company sought and acquired was not a secondary easement but a separate and distinct right of ingress and egress over all of the property owners' property. *Id*. at *825, 580 S.W.2d at **938. The court held that the utility company had acquired an easement and as such it was not authorized under Arkansas' eminent domain statutes. Although the court found that it was not necessary to rule whether a secondary easement exists in some case, the court did not reject the idea that such a right exists.

The ranch believes that TEPPCO is attempting to obtain a free easement, just like the utility company in *Loyd*. TEPPCO states that it does not need a secondary easement but as in the case of secondary easements it intends to access its right-of-way in a manner that is

---

by prescription. . . . This secondary easement can be exercised only when necessary, and in such a reasonable manner as not to needlessly increase the burden upon the servient tenement.

*Loyd*, 264 Ark. at *824, 580 S.W.2d at **937 (quoting *Virginia Electric & Power Co. v. Webb*, 196 Va. 555, 84 S.E.2d 735 (1954)).

14

reasonable and least intrusive to the servient tenement.

The deeds in this case are ambiguous as to the meaning of "restricted to a strip of land" and "premises." In light of these ambiguities, a material issues of fact exists as to the location of the right of ingress and egress, and summary judgment is inappropriate.

In its response to the motion for partial summary judgment, TEPPCO raises the question as to whether Harris Road is a public road and as such provides TEPPCO with the least burdensome means for accessing its easement. The ranch has filed a reply agreeing that Harris Road is a public road. The parties disagree, however, as to the where the public portion of Harris Road ends and the drive owned by the ranch begins. In its reply, the ranch points out that it did not file a motion for summary judgment as to that part of its counterclaim dealing with Harris Road. The ranch believes that this is an issue to be decided at trial. TEPPCO did not raise this issue in a cross-motion for summary judgment, therefore, the question as to whether Harris Road is a public road and affords TEPPCO the least burdensome means for accessing its easement is a question to be addressed during trial.

## IV. CONCLUSIONS

After viewing the evidence in a light most favorable to TEPPCO, the court finds that there are genuine issues of material fact. The language used in the deeds is ambiguous as to the location of TEPPCO's right of ingress and egress and summary judgment is, therefore, not appropriate. The ranch's motion for partial summary judgment [Doc. No. 19] is hereby denied.

15

Since the filing of its motion for partial summary judgment, the ranch has filed a motion requesting a hearing on the motion.  It believes that a hearing will "assist the court in untangling those issues which are relevant from those which are not."  The trial in this matter is set for March 16, 2009.  The court finds that a hearing is unnecessary.  All relevant issues will be addressed during the March 16 trial and the motion for hearing [Doc. No. 36] is hereby denied.

IT IS SO ORDERED this 2nd day of March, 2009.

_____
UNITED STATES DISTRICT JUDGE